UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

SHAWN RAMSEY,
Plaintiff,
v. Case No.:

CITY OF GROVELAND, FLORIDA;
KEITH KEOGH, individually;
MICHAEL JAYCOX, individually; and
TIM MASLOW, individually,
Defendants.
_______________________________________/

## COMPLAINT

Plaintiff, SHAWN RAMSEY ("Plaintiff" or "Chief Ramsey"), by and through undersigned counsel, brings this action against Defendants CITY OF GROVELAND, FLORIDA ("City"), KEITH KEOGH ("Keogh"), MICHAEL JAYCOX ("Jaycox"), and TIM MASLOW ("Maslow"), and alleges as follows:

## INTRODUCTION

This action is principally a First Amendment retaliation case arising from the City of Groveland's punishment of its longtime Chief of Police after he spoke as a private citizen concerning suspected governmental misconduct by elected City officials. Plaintiff's ordinary duties as Chief of Police concerned the management and administration of the Police Department; they did not require him to investigate, supervise, discipline, or police the conduct of the Mayor or City Council. When Plaintiff became aware of conduct he reasonably believed involved misuse of public office and public resources, abuse of governmental authority, improper interference with City administration, and violations of

Florida's open-government laws, he stepped outside his ordinary employment responsibilities and made written whistleblower disclosures in his individual capacity to governmental authorities empowered to investigate that misconduct. In addition to those formal disclosures, Plaintiff also spoke in his individual capacity as a citizen to members of the public concerning the wrongdoing and abuse of authority he believed Defendants had committed. The Eleventh Circuit has addressed a strikingly similar circumstance in *Acevedo v. Diaz de la Portilla*, No. 24-12650 (11th Cir. Aug. 26, 2026), involving a municipal police chief who reported alleged misconduct by elected officials and thereafter alleged First Amendment retaliation. Here, after Plaintiff engaged in protected citizen speech, Defendants Keogh and Jaycox sought his removal and instructed, pressured, encouraged, and/or directed Interim City Manager Tim Maslow to terminate him because of that speech. Maslow knew that Keogh and Jaycox wanted Plaintiff removed because of his protected speech and ultimately carried out that retaliatory objective by terminating Plaintiff because of that speech. The retaliatory motive is reinforced by Maslow's own admissions that he had "absolutely" no performance concerns regarding Plaintiff, that the investigations appeared to have resulted from Plaintiff's whistleblower complaints, and that any eventual termination "will not be because of any performance-related issues." Nevertheless, Maslow terminated Plaintiff for purported "Inappropriate Behavior" and "Unsatisfactory Performance." Plaintiff's discharge was therefore not the result of a legitimate performance problem, but the culmination of a sustained retaliatory campaign initiated and encouraged by Keogh and Jaycox

and ultimately implemented by Maslow because Plaintiff exercised his First Amendment rights

**PARTIES**

1. Plaintiff Shawn Ramsey is a resident of Florida and served as Chief of Police for the City of Groveland for approximately nine years.
2. Plaintiff was responsible for the management, supervision, administration, and day-to-day operations of the Groveland Police Department.
3. Defendant City of Groveland is a Florida municipal corporation located in Lake County, Florida.
4. The City is a public agency and employer covered by the Family and Medical Leave Act ("FMLA").
5. The City is an "agency," and Plaintiff was an "employee," within the meaning of section 112.3187, Florida Statutes.
6. Defendant Keith Keogh served as Mayor of Groveland at all material times and is sued in his individual capacity under 42 U.S.C. § 1983 for acts taken under color of state law.
7. Defendant Michael Jaycox served as a member of the Groveland City Council at all material times and is sued in his individual capacity under 42 U.S.C. § 1983 for acts taken under color of state law.
8. Defendant Tim Maslow served as Interim City Manager at all material times relevant to Plaintiff's discharge and is sued in his individual capacity under 42 U.S.C. § 1983 for acts taken under color of state law.

9. Under the City Charter, the City Manager possessed authority over the appointment and removal of department heads and other City employees, and Maslow made and implemented the decision to terminate Plaintiff.

## JURISDICTION AND VENUE

10. This Court has original federal-question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the First Amendment to the United States Constitution, 42 U.S.C. § 1983, and the FMLA, 29 U.S.C. §§ 2601–2654.

11. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) and (4) and 29 U.S.C. § 2617(a)(2).

12. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's claims under sections 112.3187 through 112.31895 and 440.205, Florida Statutes, because those claims arise from the same case or controversy as Plaintiff's federal claims.

13. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this action occurred in Lake County, Florida.

14. The Ocala Division is proper because Lake County lies within the Ocala Division of the Middle District of Florida.

15. All conditions precedent to the maintenance of this action have occurred, have been performed, have been satisfied, have been waived, or are otherwise excused.

16. Plaintiff timely reported the retaliation arising from his protected disclosures and complied with all administrative prerequisites applicable to his claims under the Florida Public Whistle-blower's Act.
17. No administrative exhaustion requirement bars Plaintiff's claims under 42 U.S.C. § 1983 or the FMLA.
18. True and correct copies of Plaintiff's signed, written whistleblower disclosures are attached as **Exhibits A through C** and incorporated herein by reference.

## GENERAL FACTUAL ALLEGATIONS

**Plaintiff's Employment and Protected Disclosures**

19. Before Plaintiff engaged in the protected conduct alleged herein, Defendant had not identified any documented performance deficiency warranting Plaintiff's termination, demotion, suspension, or comparable discipline.
20. In October 2024, a local business owner informed Plaintiff that then-mayoral candidate Keith Keogh had stated that, if elected, he wanted to remove the City Manager and Chief of Police.
21. Plaintiff confronted Keogh concerning the statement, which Keogh denied.
22. After Keogh was elected Mayor, Plaintiff again raised the issue. Keogh responded that his "actions will speak louder than [his] words."
23. In October 2025, Plaintiff learned that Mayor Keogh had submitted allegations concerning Plaintiff and then-City Manager Michael Hein to the Florida Department of Law Enforcement ("FDLE").

24. State Representative Taylor Yarkosky confirmed to Plaintiff that Keogh had initiated an FDLE review or investigation concerning Plaintiff and the City Manager.

25. On October 13, 2025, Keogh admitted to Plaintiff that he personally delivered allegations concerning Plaintiff, Hein, and others to FDLE and requested an investigation in his capacity as Mayor without first presenting the allegations to Plaintiff, the City Manager, or the full City Council.

26. Plaintiff reasonably believed Keogh's conduct exceeded the Mayor's authority, interfered with City administration, constituted an abuse of governmental authority, and potentially involved misuse of public resources.

27. On October 15, 2025, Plaintiff submitted a signed, written whistleblower complaint reporting suspected violations of law, misuse of governmental office and public resources, violations of the City Charter, and abuse of authority.

28. A true and correct copy of that complaint is attached as **Exhibit A**.

29. Plaintiff made the disclosure in good faith and based upon information personally obtained from Keogh, the City Attorney, Representative Yarkosky, and City records.

30. Plaintiff reasonably believed the reported conduct constituted violations or suspected violations of law, gross mismanagement, misfeasance, malfeasance, misuse of public resources, gross neglect of duty, and/or abuse of governmental authority.

31. City officials subsequently learned that Plaintiff was the whistleblower.

**The Mayor Publicly Exposes Plaintiff's Whistleblower Activity**

32. On January 15, 2026, the Groveland City Council conducted a publicly noticed workshop.
33. During that workshop, Mayor Keogh publicly discussed the existence and substance of Plaintiff's protected whistleblower complaint.
34. Immediately before doing so, Keogh expressly acknowledged: "This is probably illegal for me to say it."
35. Despite that acknowledgment, Keogh proceeded with the disclosure.
36. During the same workshop, Jaycox made statements further connecting the protected complaint to Plaintiff.
37. The statements substantially compromised Plaintiff's identity as the whistleblower and exposed his protected activity to public hostility and scrutiny.

**Additional Protected Disclosures**

38. In February 2026, Plaintiff learned of alleged private communications by Keogh concerning City Manager Hein's anticipated separation and Maslow's potential selection as Interim or Acting City Manager.
39. Plaintiff reasonably believed those communications potentially involved improper polling or serial communications among elected officials regarding matters foreseeably coming before the City Council.
40. On or about February 22, 2026, Plaintiff executed another signed, written complaint reporting suspected misuse of public position and public resources, including suspected misuse of City funds and City-contracted legal services.

41. A true and correct copy of that complaint is attached as **Exhibit B**.

42. Plaintiff also executed a signed, written complaint reporting suspected violations of Florida's Government-in-the-Sunshine Law, including suspected serial communications and private discussions concerning the City Manager's separation and selection of an interim replacement.

43. A true and correct copy of that complaint is attached as **Exhibit C**.

44. Plaintiff submitted those complaints to governmental authorities, including the Office of the State Attorney and Florida Commission on Ethics.

45. Plaintiff made each disclosure in good faith based upon information conveyed to him by City officials, statements by Keogh, and records concerning the reported conduct.

46. On February 25, 2026, Plaintiff expressly requested that Maslow and the City Attorney continue treating his whistleblower identity as confidential.

**Public Hostility and Efforts to Remove Plaintiff**

47. By March 2026, Plaintiff's whistleblower status had become publicly known.

48. On March 3, 2026, Jennifer Eastridge emailed Maslow and members of the City Council using the subject line "Ramsey Whistleblower Complaint" and expressly identified Plaintiff as the whistleblower.

49. Plaintiff repeatedly advised City officials that his whistleblower identity remained protected and complained about the retaliation and hostility resulting from its disclosure.

50. On April 1, 2026, Maslow informed Plaintiff that Jaycox had asked:

"How much longer are we going to allow Chief Ramsey to continue working for the City of Groveland?"

51. Jaycox identified no performance deficiency, disciplinary violation, or legitimate employment basis for seeking Plaintiff's removal.

52. On April 6, 2026, the Office of the State Attorney confirmed in writing that its investigation had concluded and that there was "no evidence of any crime whatsoever."

53. Despite that conclusion, the attacks and employment-related scrutiny continued.

54. On April 7, 2026, Plaintiff confronted Jaycox regarding his statement concerning Plaintiff's continued employment.

55. Jaycox admitted making the statement.

56. Jaycox further stated that several constituents knew Plaintiff was the whistleblower and that it was obvious Plaintiff did not approve of the direction in which the City Council was moving.

57. Jaycox again identified no legitimate performance deficiency during Plaintiff's approximately nine years of service as Chief.

**Plaintiff Reports Retaliation and the Investigations Escalate**

58. On April 9, 2026, Plaintiff formally reported suspected whistleblower retaliation.

59. On April 10, Plaintiff informed Maslow that he had filed the retaliation complaint.

60. On April 15—within days of Plaintiff's retaliation complaint—Jaycox requested extensive records regarding a police use-of-force incident approximately two years old and proposed that the City Council revisit Plaintiff's determination concerning that incident.

61. Plaintiff reported to Maslow that Jaycox's conduct appeared to constitute improper political interference with day-to-day Police Department operations.

62. On April 29, Maslow informed Plaintiff that the City intended to initiate additional investigations based upon allegations made by Eastridge.

63. Plaintiff directly asked Maslow whether he had any concerns regarding Plaintiff's performance.

64. Maslow responded: "Absolutely not."

65. On May 11, Maslow and Human Resources Director Deo Persaud informed Plaintiff that Gray Robinson would investigate several complaints against him, including matters previously reviewed and Plaintiff's earlier use-of-force determination.

66. When Plaintiff asked who was driving the investigations, Maslow stated that they were being encouraged by persons associated with "Keeping Groveland Honest" and members of the City Council.

67. Plaintiff expressly advised Maslow and Persaud that the repeated investigations were retaliatory and were creating a hostile working environment because of his whistleblower complaints.

68. Nevertheless, Defendant subjected Plaintiff to multiple outside and overlapping investigations involving recycled, stale, unsupported, and/or previously rejected allegations.

69. Those investigations weakened Plaintiff's command authority, damaged his professional standing, interfered with his administration of the Police Department, and placed his continued employment in jeopardy.

**City Management Confirms the Retaliatory Motive**

70. On June 29, 2026, Maslow informed Plaintiff that several investigations had effectively concluded without findings of wrongdoing.

71. Maslow further acknowledged that the investigations appeared to have resulted from Plaintiff's whistleblower complaints.

72. On July 14, 2026, Maslow acknowledged that repeated second-guessing of Plaintiff's decisions demonstrated that certain City Council members no longer wanted Plaintiff to remain Chief. Keogh and Jaycox instructed, pressured, encouraged, and/or directed Maslow to terminate Plaintiff because of Plaintiff's whistleblower disclosures and other constitutionally protected speech concerning governmental wrongdoing.

73. Maslow then stated that, if Plaintiff were ultimately terminated, "it will not be because of any performance-related issues."

74. Those statements were consistent with Maslow's earlier unequivocal representation that he had "absolutely" no performance concerns regarding Plaintiff.

75. The City therefore knew that the escalating investigations, political interference with Plaintiff's command decisions, and efforts directed toward his continued employment were unrelated to any documented performance deficiency.

**Plaintiff's Constitutionally Protected Speech**

76. Plaintiff's ordinary responsibilities as Police Chief concerned management, supervision, administration, and day-to-day operation of the Police Department.

77. Those duties did not include investigating, disciplining, supervising, or exercising administrative authority over the Mayor or City Council.

78. Plaintiff made the whistleblower disclosures alleged herein outside the ordinary scope of his Police Department duties and reported suspected governmental misconduct to authorities having power to investigate or remedy it. In addition to those formal whistleblower complaints, Plaintiff spoke in his individual capacity as a citizen to members of the public concerning the wrongdoing, misuse of public office, abuse of authority, and other governmental misconduct alleged herein..

79. Plaintiff therefore spoke in his individual capacity as a citizen, and not pursuant to his ordinary duties as Chief of Police, concerning matters of substantial public concern, including suspected violations of law, misuse of

public office and public resources, governmental integrity, abuse of authority, and open-government requirements.

80. Plaintiff's speech did not prevent him from performing his duties, and City management repeatedly acknowledged that it had no legitimate performance concerns regarding him.

**FMLA, Workers' Compensation, and Termination**

81. During July 2026, Plaintiff informed Maslow that the continuing workplace conditions were adversely affecting his health and that he had begun taking blood-pressure medication.

82. On July 28, 2026, Plaintiff attended a medical appointment, completed the requested medical certification relating to intermittent FMLA leave, obtained a fitness-for-duty letter, and transmitted the documentation to Human Resources Director Persaud.

83. Human Resources acknowledged receipt on July 29, 2026.

84. Defendant therefore had actual notice of Plaintiff's request for FMLA-protected leave and supporting medical documentation no later than July 29.

85. On that same day, Maslow questioned why Plaintiff would continue to be employed under the conditions he was experiencing.

86. Shortly thereafter, Persaud encouraged Plaintiff to consider a separation arrangement and stated, in substance, that Plaintiff's job was not worth risking his health.

87. Plaintiff rejected separation and made clear that he wanted to remain Chief.

88. Despite receiving Plaintiff's completed documentation, Defendant did not timely provide Plaintiff with written notice formally designating the requested leave as FMLA-protected.

89. On or about August 8, 2026, Persaud again asked Plaintiff what "off-ramp" he would accept.

90. During that conversation, Persaud stated that Plaintiff "ha[d] [his] FMLA" and should use it.

91. Persaud further acknowledged that Plaintiff had always acted professionally and remained an asset to the City.

92. On August 11, 2026, Plaintiff submitted a workers' compensation claim concerning his hypertension and related medical condition.

93. Defendant's subsequent Employee Notice Discipline asserted that Maslow decided to terminate Plaintiff on August 12, 2026—the very next day.

94. Plaintiff was not informed on August 12 that any termination decision had supposedly been made.

95. On August 25, 2026, Defendant terminated Plaintiff effective immediately while his FMLA documentation remained on file.

96. The termination notice asserted "Inappropriate Behavior" and "Unsatisfactory Performance."

97. The asserted performance rationale directly conflicts with Maslow's prior statements that he had "absolutely" no performance concerns and that any termination would not be performance-related.

98. It likewise conflicts with Persaud's acknowledgment that Plaintiff had acted professionally and remained an asset to the City.

99. On August 27, 2026, a City Human Resources Specialist reportedly confirmed that Plaintiff's FMLA documentation had been on file when Plaintiff was terminated.

100. Human Resources personnel also reportedly discovered that Plaintiff's workers' compensation materials had not been forwarded for processing when Plaintiff originally submitted them.

101. The chronology is powerful evidence of retaliation and pretext: Defendant acknowledged Plaintiff's FMLA documentation on July 29; Maslow questioned his continued employment that same day; Human Resources thereafter repeatedly discussed separation; Plaintiff submitted his workers' compensation claim on August 11; Defendant claims Maslow decided to terminate him August 12; and Defendant discharged him August 25.

102. Defendant's asserted reasons for Plaintiff's termination are false, exaggerated, inconsistent, unsupported, selectively invoked, and/or pretextual.

## COUNT I
## FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983
## Against Defendants Keogh, Jaycox, and Maslow Individually

103. Plaintiff realleges paragraphs 1 through 102 to the extent applicable to Plaintiff's protected speech and each individual Defendant's retaliatory conduct.

104. At all material times, Keogh, Jaycox, and Maslow acted under color of state law.

105. Plaintiff's ordinary job responsibilities involved management and administration of the Police Department and did not require him to investigate, supervise, or discipline the Mayor or City Council.

106. Plaintiff spoke as a citizen when he reported suspected misconduct by elected officials outside the ordinary scope of his Police Department duties and to governmental authorities possessing authority to investigate or remedy that misconduct.

107. Plaintiff's speech addressed matters of substantial public concern, including suspected violations of law, misuse of public office and resources, governmental integrity, abuse of authority, and circumvention of open-government requirements.

108. A public employee does not lose First Amendment protection merely because the subject of his speech concerns information learned through public employment. *Lane v. Franks*, 573 U.S. 228, 239–40 (2014).

109. The Eleventh Circuit has likewise recognized that a high-ranking municipal employee may speak as a citizen when reporting suspected misconduct by elected officials outside his ordinary job responsibilities. *Carollo v. Boria*, 833 F.3d 1322, 1329–31 (11th Cir. 2016).

110. Keogh personally participated in the retaliation by publicly exposing Plaintiff's protected whistleblower complaint after acknowledging that doing

so was "probably illegal" and thereafter participating in conduct that undermined Plaintiff's authority and professional standing.

111. Jaycox personally participated by openly questioning how much longer Plaintiff should remain employed, acknowledging Plaintiff's whistleblower status and disagreement with the Council's direction, and initiating renewed scrutiny of a stale Police Department matter shortly after Plaintiff formally complained of retaliation.

112. Maslow knew of Plaintiff's protected speech, acknowledged that the investigations appeared to result from Plaintiff's whistleblower complaints, expressly denied having performance concerns, and nevertheless made and implemented Plaintiff's termination on purported performance grounds.

113. The individual Defendants' conduct was sufficiently adverse to deter a person of ordinary firmness from engaging in similar protected speech.

114. Plaintiff's protected speech was a substantial or motivating factor in the retaliatory conduct taken against him.

115. Defendants would not have taken the same actions in the absence of Plaintiff's protected speech.

116. The constitutional protection afforded public employees who speak as citizens on matters of public concern outside their ordinary job duties was clearly established before the conduct alleged herein. See *Lane*, 573 U.S. at 238–42; *Carollo*, 833 F.3d at 1329–31.

117. As a direct and proximate result, Plaintiff suffered loss of employment, wages, benefits, professional standing, reputational injury, emotional distress, and other compensable harm.

**WHEREFORE**, Plaintiff demands judgment against Defendants Keogh, Jaycox, and Maslow individually for compensatory damages, punitive damages to the extent permitted by law, declaratory and equitable relief, prejudgment and post-judgment interest, reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and all further relief permitted by law.

## COUNT II
## FIRST AMENDMENT RETALIATION — MUNICIPAL LIABILITY UNDER 42 U.S.C. § 1983
## Against Defendant City of Groveland

118. Plaintiff realleges paragraphs 1 through 117 to the extent applicable to Defendant City.

119. Plaintiff engaged in citizen speech protected by the First Amendment, and that speech was a substantial or motivating factor in his termination.

120. Plaintiff does not seek to impose municipal liability upon the City merely because it employed an alleged constitutional tortfeasor.

121. Rather, municipal liability arises because the challenged termination was made and implemented by an official possessing final policymaking authority concerning Plaintiff's removal.

122. A municipality may be liable under 42 U.S.C. § 1983 where a constitutional injury results from the decision of an official possessing final policymaking

authority over the subject matter at issue. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978).

123. Whether an official possesses final policymaking authority is determined by applicable state and local law. *Scala v. City of Winter Park*, 116 F.3d 1396, 1399–1401 (11th Cir. 1997).

124. Under the Groveland City Charter, the City Manager possesses authority regarding appointment and removal of department heads and other City employees.

125. Maslow served as Interim City Manager and possessed final policymaking authority with respect to the challenged decision terminating Plaintiff.

126. Maslow exercised that authority when he made and implemented Plaintiff's termination.

127. Maslow knew Plaintiff had engaged in protected speech and formally complained of retaliation.

128. Maslow acknowledged that the investigations appeared to have resulted from Plaintiff's whistleblower complaints.

129. Maslow stated that he had "absolutely" no performance concerns regarding Plaintiff and that any eventual termination would not be performance-related.

130. Maslow nevertheless terminated Plaintiff based upon purported "Inappropriate Behavior" and "Unsatisfactory Performance."

131. Plaintiff's protected speech was a substantial or motivating factor in the termination decision. Keogh and Jaycox sought Plaintiff's removal and

instructed, pressured, encouraged, and/or directed Maslow to terminate Plaintiff because of that speech. Maslow knew the effort to remove Plaintiff was motivated by his protected speech and, exercising final authority over Plaintiff's termination, carried out that retaliatory objective by terminating Plaintiff because of his constitutionally protected speech.

132. The constitutional injury therefore resulted directly from an official municipal decision made by the official possessing final authority over Plaintiff's termination.

133. As a direct and proximate result, Plaintiff suffered loss of employment, wages, benefits, professional standing, career opportunities, and other compensable injury.

**WHEREFORE**, Plaintiff demands judgment against Defendant City of Groveland for compensatory damages, reinstatement and/or front pay, declaratory and equitable relief, prejudgment and post-judgment interest, reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and all further relief permitted by law.

## COUNT III
## RETALIATION IN VIOLATION OF THE FLORIDA PUBLIC WHISTLE-BLOWER'S ACT
## § 112.3187, Florida Statutes
## Against Defendant City of Groveland

134. Plaintiff realleges paragraphs 1 through 102 as though fully set forth herein.

135. Defendant City is an "agency," and Plaintiff was an "employee," within the meaning of section 112.3187, Florida Statutes.

136. Plaintiff engaged in protected activity through the signed, written disclosures attached as Exhibits A, B, and C concerning conduct he reasonably and in good faith believed constituted violations or suspected violations of law, gross mismanagement, malfeasance, misfeasance, misuse of public resources, gross neglect of duty, and/or abuse of authority.

137. Defendant knew of Plaintiff's protected disclosures.

138. After acquiring that knowledge, Defendant subjected Plaintiff to public exposure, repeated and overlapping investigations, renewed scrutiny of stale matters, interference with his command authority, political efforts to secure his removal, and ultimately discharge.

139. The causal relationship is demonstrated by Defendant's knowledge, the escalating chronology, the absence of legitimate preexisting performance concerns, the recycling of stale allegations, and Maslow's express admissions concerning both the source of the investigations and the absence of performance problems.

140. The August 25 termination notice's reliance upon purported "Unsatisfactory Performance" directly contradicts those earlier admissions.

141. Defendant's stated reasons are pretextual, and Defendant would not have subjected Plaintiff to the same adverse personnel actions in the absence of his protected disclosures.

142. As a direct and proximate result, Plaintiff suffered lost wages and benefits, loss of employment, diminished professional standing, and other damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant City of Groveland for all legal and equitable relief authorized by section 112.3187, including reinstatement and/or front pay, lost wages and benefits, restoration of employment rights, reasonable attorneys' fees and costs, interest, injunctive relief, and such further relief as the Court deems appropriate.

**COUNT IV**
**INTERFERENCE WITH RIGHTS UNDER THE FAMILY AND MEDICAL LEAVE ACT**
**29 U.S.C. §§ 2612, 2614, 2615(a)(1), and 2617**
**Against Defendant City of Groveland**

143. Plaintiff realleges paragraphs 1 through 18 and 81 through 102 as though fully set forth herein.

144. Defendant is a covered employer, and Plaintiff was an eligible employee under the FMLA.

145. Plaintiff had worked for Defendant for approximately nine years and had worked at least 1,250 hours during the twelve months preceding his request for leave.

146. Plaintiff suffered from a serious health condition for which he sought qualifying medical leave.

147. Plaintiff submitted completed medical certification and supporting documentation on July 28, 2026, which Defendant acknowledged on July 29.

148. Defendant therefore had actual notice of Plaintiff's request for qualifying FMLA leave.

149. Defendant failed to timely administer and appropriately designate Plaintiff's qualifying leave.

150. Human Resources nevertheless expressly acknowledged that Plaintiff "ha[d] [his] FMLA" and should use it.

151. Defendant thereafter terminated Plaintiff while his FMLA documentation remained on file, preventing him from obtaining the full benefit of the leave and restoration rights protected by federal law.

152. An employer may violate the FMLA by interfering with, restraining, or denying an employee's exercise of a benefit to which the employee is entitled. *Strickland v. Water Works & Sewer Board of City of Birmingham*, 239 F.3d 1199, 1206–08 (11th Cir. 2001).

153. Defendant cannot establish that Plaintiff necessarily would have been terminated for wholly unrelated and legitimate reasons, particularly given Defendant's own contradictory statements concerning Plaintiff's performance.

154. Plaintiff suffered actual prejudice, including loss of employment, wages, benefits, and restoration rights.

**WHEREFORE**, Plaintiff demands all relief authorized by 29 U.S.C. § 2617, including lost compensation and benefits, interest, liquidated damages where

authorized, reinstatement and/or front pay, reasonable attorneys' fees and costs, equitable relief, and all further relief permitted by law.

**COUNT V**
**RETALIATION IN VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT**
**29 U.S.C. §§ 2615 and 2617**
**Against Defendant City of Groveland**

155. Plaintiff realleges paragraphs 1 through 18 and 81 through 102 as though fully set forth herein.

156. Plaintiff engaged in protected activity by requesting qualifying FMLA leave, submitting medical certification and supporting documentation, and attempting to exercise rights protected by the FMLA.

157. Defendant had actual knowledge of Plaintiff's protected activity no later than July 29, 2026.

158. Maslow questioned Plaintiff's continued employment that same day, and Human Resources thereafter repeatedly encouraged Plaintiff to consider separating from the City.

159. Plaintiff rejected those efforts and made clear that he wanted to remain Chief.

160. Defendant subsequently terminated Plaintiff on August 25, 2026.

161. Under Eleventh Circuit law, an FMLA retaliation claim requires but-for causation. *Lapham v. Walgreen Co.*, 88 F.4th 879, 893–94 (11th Cir. 2023).

162. Plaintiff specifically alleges that, but for his exercise and attempted exercise of FMLA rights, Defendant would not have terminated him when and as it did.

163. The extremely close timing, repeated separation discussions, Human Resources' express recognition of Plaintiff's FMLA status, and Defendant's contradictory performance explanations establish causation and pretext.

164. As a direct and proximate result, Plaintiff suffered lost wages, benefits, employment rights, and other recoverable damages.

**WHEREFORE**, Plaintiff demands all damages and equitable relief available under 29 U.S.C. § 2617, including reinstatement and/or front pay, lost compensation and benefits, interest, liquidated damages where authorized, reasonable attorneys' fees and costs, and all additional relief permitted by law.

## COUNT VI
## RETALIATION FOR PURSUING WORKERS' COMPENSATION BENEFITS
## § 440.205, Florida Statutes
## Against Defendant City of Groveland

165. Plaintiff realleges paragraphs 1 through 18 and 81 through 102 as though fully set forth herein.

166. Section 440.205, Florida Statutes, prohibits an employer from discharging an employee because of the employee's valid claim for compensation or attempt to claim compensation under Florida's Workers' Compensation Law.

167. Florida recognizes a civil cause of action for retaliatory discharge under section 440.205. *Smith v. Piezo Technology & Professional Administrators*, 427 So. 2d 182, 184 (Fla. 1983).

168. On August 11, 2026, Plaintiff submitted a workers' compensation claim concerning his hypertension and related medical condition.

169. Plaintiff thereby made and/or attempted to make a claim for compensation protected by section 440.205.

170. Defendant possessed knowledge of Plaintiff's claim through its Human Resources personnel.

171. On information and belief, Plaintiff's workers' compensation claim and/or attempt to obtain workers' compensation benefits was known to City personnel involved in Plaintiff's employment status and termination.

172. Defendant subsequently asserted that Maslow decided to terminate Plaintiff on August 12, 2026—one day after Plaintiff submitted his claim.

173. Defendant terminated Plaintiff on August 25, 2026.

174. Human Resources thereafter reportedly discovered that Plaintiff's workers' compensation materials had not been forwarded for processing when originally submitted.

175. The extraordinary temporal proximity, together with Defendant's shifting explanations and contemporaneous treatment of Plaintiff's medical and leave-related rights, supports a causal relationship between Plaintiff's protected activity and his termination.

176. See *Salus v. Island Hospitality Florida Management, Inc.*, 289 So. 3d 926, 929 (Fla. 4th DCA 2020).

177. As a direct and proximate result, Plaintiff suffered loss of employment, wages, benefits, and other recoverable damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant City of Groveland for all damages and other legal and equitable relief recoverable under Florida law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff SHAWN RAMSEY respectfully requests that this Court enter judgment in his favor and against the applicable Defendants and:

A. Declare that Defendants retaliated against Plaintiff for speech protected by the First Amendment in violation of 42 U.S.C. § 1983;

B. Declare that Defendant City retaliated against Plaintiff in violation of the Florida Public Whistle-blower's Act;

C. Declare that Defendant City interfered with and retaliated against Plaintiff's exercise of rights protected by the FMLA;

D. Declare that Defendant City retaliated against Plaintiff for pursuing and/or attempting to pursue workers' compensation benefits;

E. Award Plaintiff all recoverable lost wages, salary, benefits, retirement contributions, remuneration, and other economic damages;

F. Reinstate Plaintiff to his former position as Chief of Police or, if reinstatement is impracticable, award appropriate front pay;

G. Restore Plaintiff's seniority, retirement rights, benefits, employment privileges, and other employment rights;

H. Award liquidated damages as authorized by 29 U.S.C. § 2617;

I. Award compensatory damages against the applicable Defendants;

J. Award punitive damages against the individual Defendants to the extent permitted by law;

K. Award appropriate declaratory and injunctive relief;

L. Award prejudgment and post-judgment interest;

M. Award Plaintiff his reasonable attorneys' fees and taxable costs pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 2617, section 112.3187, Florida Statutes, and all other applicable authority; and

N. Grant such further legal and equitable relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands trial by jury on all issues so triable.

Dated: September 9, 2026.

Respectfully submitted,

/s/ Anthony F. Sabatini
**ANTHONY F. SABATINI, ESQ.**
Florida Bar No. 1018163
SABATINI LAW FIRM, P.A.
1601 E. 1st Avenue
Mount Dora, Florida 32757
T: (352) 455-2928
anthony@sabatinilegal.com

/s/ Gavin B. Rollins
**GAVIN B. ROLLINS, ESQ.**
Florida Bar No. 1064417
SABATINI LAW FIRM, P.A.
1601 E. 1st Avenue
Mount Dora, Florida 32757
T: (352) 328-4892
gavin@sabatinilegal.com

# EXHIBIT A

In October 2024, the owner of a local business notified me that Mayor candidate Keith Keogh told others that if elected, he would want to get rid of the City Manager and Chief of Police.

During October of 2024, I confronted then-candidate for Mayor Keogh about what he had previously been told by the business owner. Keogh denied ever mentioning he wanted to rid the City of the City Manager, Michael Hein and me.

Early November 2024, I met with the now Mayor Keogh Elect in my office (Mayor introductions to department heads of the City of Groveland). Spoke directly to him in reference to my previously confronting him prior to him becoming Mayor, his response: "my actions will speak louder than my words."

October 8, 2025, I learned the City Attorney billed Groveland for communication with Mayor about connecting him with FDLE October 08, 2025, I Spoke to State Representative Yarkowski in reference to Mayor possibly dropping off information to the State Representative pertaining to an FDLE investigation previously initiated by Mayor and the lack of response from FDLE other than FDLE verbally telling the Mayor there was nothing worthy of further investigation in the complaint filed by the Mayor. Yarkowski confirmed that the Mayor initiated a previous investigation into possibly criminal or civil wrongdoings of the City Manager, Michael Hein, and me. Yarkowski confirmed that the Mayor provided Yarkowski with the allegations and contact information for a Jennifer Eastridge, "Self-proclaimed community activist" and administrator of the website "Keeping Groveland Honest," to further answer any questions Yarkowski may have pertaining to the allegations. Yarkowski confirmed that the Mayor provided him with contact information for the FDLE agent assigned to follow-up on the complaint the mayor had previously filed in hopes of Yarkowski obtaining written confirmation of FDLE receiving the initial complaint submitted by the Mayor, indicating that the investigations had been reviewed and all allegations were unsubstantiated as the mayor was previously informed verbally on more than one occasion by the receiving FDLE Agent.

October 10, 2025, I Spoke with City Manager and informed him that I had spoken to State Representative Yarkowski and confirmed that the mayor as the Mayor of Groveland had previously submitted written allegations of unknown wrongdoing of the City Manager and me as the Chief of Police to FDLE, as the Mayor, and my concerns as to why the Mayor would do such a thing without confronting the City Manager or me prior. I informed the City Manager that my intentions would be to meet with the Mayor and ask for an explanation for his actions and secrecy.

October 13, 2025, I requested a meeting with the Mayor in reference to the information I learned from State Representative Yarkowski. I met with the mayor in my office at the Public Safety building while I was on duty. During this meeting, I confronted him about initiating the investigation with FDLE and as to why. The Mayor informed me of the following: In November 2024, shortly after becoming Mayor he received a packet of information outlining allegations of wrongdoing and a cover-up pertaining to an incident that had previously occurred nearly six years ago. And documented in a Groveland Police report detailing a criminal mischief that had occurred, damaged motorcycle owned by the City Manager and primarily operated by his then 20 YOA son. For more information, refer to Groveland Police case number 19122091.

According to the Mayor, the information outlined a cover-up of the City Manager's son committing a sexual assault on the girlfriend of the person responsible for the criminal mischief of the motorcycle. The information went on to describe myself and possibly others, covering up the alleged sexual assault. The information, according to the Mayor, described the City Manager committing insurance fraud as a result of the motorcycle being damaged and his insurance paying for the repairs. The Mayor explained that shortly after becoming Mayor, he had delivered the information directly to FDLE in hopes of FDLE providing a complete review of the allegations and bringing closure to the allegations one way or another. The Mayor mentioned several times that he had attempted to reconnect with the agent from FDLE to obtain, in writing, confirmation that a review had been concluded and that none of the allegations were substantiated. The Mayor confirmed that he was informed of the conclusion by the FDLE agent verbally on several occasions, yet had not received anything in writing from FDLE as of date. Becoming frustrated, he asked our City Attorney Anita Carver for options to contact FDLE and obtain the final summary of their findings. The attorney encouraged the Mayor to reach out to our State Representative to help connect the Mayor with FLDE. During our conversation, the Mayor confirmed that he personally provided FDLE with this information and requested the investigation as the Mayor of Groveland, feeling this was the best way to reach a conclusion without causing public suspicion and adding to the unwarranted suspicion of a cover-up on behalf of the city. I expressed my concerns to the Mayor about his actions and not confronting myself with the City Manager initially. I questioned as to if the manner in which the Mayor handled the information, by formally going to FDLE with the information, was improper. The Mayor responded by stating he had been in upper management previously and that secret inquiries and investigations are exactly how private business would handle such allegations, and if he had to do this over again, he would do the same thing again by going directly to an outside investigative entity as the mayor and complete an investigation without the knowledge of others.

I felt compelled to research his actions. My research has led me to believe that the Mayor by F.S.S. (Florida Law) is only one member of the City Manager / Council strong form of government. The Mayor lacks the authority to conduct any investigation into allegations of staff members' wrongdoing. This is clearly a violation of the City of Groveland's Charter and F.S.S. All inquiries into the wrongdoings of staff must be initiated by the City Manager. Without the consent or knowledge of the Council, the mayor violates the City of Groveland's Charter by taking such allegations to an investigative body and conducting such investigations in secrecy. the Mayor admitted to holding such information (written allegation of wrongdoings by staff). " The Mayor stated he received the written allegations in November 2024," now 11 months later, violating "Florida Sunshine Laws." I believe that the citizens of the City of Groveland deserve better than to hold secret investigations, and I believe that Florida law requires the Mayor to conduct such matters in "Sunshine" public view and with the consent of all of the council.

On October 14, 2025, after completing the described and concerning research, I made contact Via telephone with the City of Groveland Attorney Anita Carver. During my conversation with the City Attorney, I spoke of Whistleblower protections for myself and the additional city employees in the attached information. I spoke in depth about my findings and allegations presented by the Mayor to FDLE pertaining to the City Manager and me. I learned from the City Attorney that the Mayor had only made her aware of the complaint being filed with FDLE. The Mayor presented the City Attorney with Email correspondence between the Mayor and FDLE pertaining to the alleged investigation he had initiated. The corresponding emails indicated several reasons why a representative from FDLE had not yet responded in writing to the Mayor with a summary of findings.

On October 16, 2025, I paid the required fee to the City of Groveland for my requested public information, a sum of approximately $96.00 for which was explained to me to consist of approximately 400 Emails between the City of Groveland Mayor and the Florida Department of Law Enforcement.

My concerns about the wrongdoing by the Mayor and perhaps other councilmembers, Amy Jo Carrol, and Vice Mayor Barbara Gains are supported by circumstances,direct conversations with the Mayor and councilmembers are as follows:

> ***Public consensus required**: A mayor's attempts to interfere with staff or launch their own investigation could violate the city charter. This often requires a public, consensus vote of the elected body to authorize an investigation.*
>
> ***In Florida, a mayor does not have the power to conduct unilateral investigations. Instead, the authority to investigate allegations of misconduct or***

***corruption lies with state-level bodies like the Florida Department of Law Enforcement***

***(FDLE) or the Florida Commission on Ethics, or with specific local ethics commissions where authorized.***

By his own admission on October 8, 2025, the Mayor confirmed with me he had obtained a packet of information shortly after being elected in November 2024. The packet of information was provided to the Mayor by members of the "Keeping Groveland Honest Facebook platform, of which the newly elected Groveland Councilwoman, Amy Jo Carroll, was and continued to be one of the primary administrators.

***In Florida, the mayor and other members of a public body cannot use third parties to circumvent the Government-in-the-Sunshine Law. Using an intermediary to communicate about public business outside of a public meeting is an illegal "secret" or "de facto" meeting.***

***Acting as a liaison: If a mayor and another council member are using a staff member, resident, or other person to relay information back and forth about a matter on which foreseeable action will be taken, they are unlawfully conducting a de facto meeting.***

It could be understood that Mayor Keogh and Councilwoman Carrol had conversations about the packet of information provided to the mayor, either directly or indirectly through Councilwoman Carrol's close associate and co-administrator, Jennifer Eastridge, AKA Jen Kathleen, a third-party self-proclaimed community activist.

***In Florida, a mayor is subject to the Sunshine Law if they are a member of the city council or have a voice in decision-making, such as the power to break a tie. The law does not apply to discussions with staff that would not come before the council for a vote. The rules prohibit:***
***Private discussions: Two or more city council members, including the mayor, cannot discuss city business outside of an official, noticed public meeting.***

***Intermediaries: Public officials cannot use an intermediary, like a staff member, to relay information or messages that would constitute a private discussion.***

> ***Electronic communication: Emails, text messages, and phone calls between a quorum of officials regarding city business can violate the law.***

The Mayor openly admitted to me directly that he received such information in November of 2024, from a third party. The information consists of the same information previously gathered by "Keeping Groveland Honest." This information was discussed at length between the Mayor and the third party was ultimately responsible for encouraging the Mayor to present the information to FDLE for a unilateral investigation and or review to be conducted at the Mayor's request by FDLE. Several communications between the Mayor, Councilwoman Carrol, Jennifer Eastridge, and Vice-Mayor Gains would have occurred VIA in-person conversations, text, and utilizing Jennifer Eastridge as the third-party Intermediary while waiting for the return of the unauthorized investigation filed by Mayor Keogh. The actions of the Mayor were without the consent or knowledge of the complete Groveland Council and outside of "sunshine" or a public meeting.

> ***In Florida, a mayor generally cannot withhold complaints against city staff from other members of the city council. The state's Public Records Act and "Sunshine Law" ensure broad access to municipal records and government transparency. The relevant laws and applications include:***
>
> ***Broad definition of public records: Florida's Public Records Act (Chapter 119, Florida Statutes) defines public records very broadly. It includes all materials made or received by an agency in connection with official business, regardless of their physical form. This includes complaints, emails, and other records concerning city employees.***

The Mayor openly admits to obtaining what he believed to be information about inappropriate conduct by City of Groveland employees. He stated that he secured this information in early November 2024. He further added that he held this information and requested a secret investigation or review by the Florida Department of Law Enforcement without sharing the information in a public meeting. As of today's date, not all councilmembers have knowledge of the unilateral complaint or review requested by Mayor Keogh in his official capacity as Mayor.

These findings are both troubling and concerning to me. I find myself with no other option than to pursue an official whistleblower complaint so that these violations of the

Groveland City Charter and F.S.S. may be addressed transparently. The Citizens of Groveland deserve better, and I am prepared to cooperate in any way possible to bring a resolution.

Shawn Ramsey
10-15-25

# EXHIBIT B

**EXHIBIT B**

**Name:** Shawn Ramsey (Chief of Police)
**Email:** Shawn.Ramsey@Groveland-FL.Gov
**Address:** City of Groveland

**Accused:** Mayor Keith Keogh, City of Groveland, Florida
**Alleged Violations:** Florida Statute § 112.313(6) (Misuse of Public Position) and § 112.313(7) (Conflicting Employment or Contractual Relationship).
**Statement:**

1. **Misuse of Public Funds for Personal Interest:** Beginning on or about June 04, 2025, Mayor Keith Keogh utilized his public office to direct City of Groveland funds toward a criminal investigation. Mayor Keogh previously initiated this investigation in a personal capacity rather than as an official city mandate. Under § 112.313(6), a public official may not use their official position or any property/resource within their trust to secure a special privilege, benefit, or exemption for themselves.

2. **Unauthorized Use of City Staff/Professional Services:** Mayor Keogh directed City Attorney Anita Geraci-Carver to provide professional legal services to assist with this private investigation. The use of city-contracted legal personnel for personal matters constitutes improper use of public resources for private benefit.

3. **Conflict of Interest:** By utilizing the City Attorney—who is tasked with representing the city's municipal interests—to further a personal investigation, Mayor Keogh has created a conflict between his private interests and his public duties, in violation of the standard of conduct for public officers.

**Evidence to Attach:**

Public records of invoices from the Law Office of Anita Geraci-Carver, PA, showing billable hours related to the Mayor's specific investigation.
Correspondence from the City Manager or Clerk regarding the allocation of funds for this purpose.

**Date** 2/22/26
**Complainant** Chief Shawn Ramsey
**Complainant Signature** [signature]

# WHISTLEBLOWER COMPLAINT: FORMAL ALLEGATION OF SUNSHINE LAW VIOLATION

**TO:** Office of the State Attorney, 5th Judicial Circuit / Florida Commission on Ethics
**FROM:** Shawn Ramsey
**DATE:** February 22, 2026
**SUBJECT:** Alleged Sunshine Law Violations by **Mayor Keith Keogh**, City of Groveland

## 1. ENTITIES AND INDIVIDUALS INVOLVED

- **Subject of Complaint:** Mayor Keith Keogh, City of Groveland.
- **Witnesses to Communication:** Councilwoman **Amy Jo Carroll**, Interim City Manager **Tim Maslow**, City Attorney **Anita Geraci-Carver**, and other members of the **Groveland City Council**.

## 2. DESCRIPTION OF ALLEGED VIOLATIONS

This complaint alleges that Mayor Keith Keogh engaged in improper "serial communications" and "polling" of elected officials outside of a noticed public meeting, in direct violation of Florida Statute 286.011 (Sunshine Law).

- **Circumvention of Public Process:** Prior to the official public meeting, Mayor Keogh reportedly initiated telephone conversations with multiple elected officials to discuss a future agenda item regarding the **Michael Hein separation agreement**.
- **Direct Influence/Polling:** During these private calls, the Mayor explicitly informed at least one voting member, **Amy Jo Carroll**, that the council needed to ensure Community Development Director **Tim Maslow** was voted into the role of Interim City Manager.
- **Admission of Conduct:** At a scheduled public workshop on **Thursday, February 19, 2026**, Mayor Keogh openly acknowledged his direct, private communication with each elected official regarding the separation agreement and interim appointment.

## 3. EVIDENCE OF DISCLOSURE

During the aforementioned workshop on February 19, 2026, Councilwoman Amy Jo Carroll approached Interim City Manager Tim Maslow and City Attorney Anita Geraci-Carver to disclose and "confide" the details of the private conversations initiated by Mayor Keogh. Several other voting members have since confirmed they were also contacted by the Mayor regarding these matters prior to any open meeting.

**4. LEGAL IMPLICATIONS**

Under Florida law, a knowing violation of the Sunshine Law is a **second-degree misdemeanor**. Private discussions between board members about matters that will foreseeably come before that board for action are strictly prohibited to ensure the public's right to witness the decision-making process.

**5. REQUESTED ACTION**

I request a formal investigation into these communications to determine if the City Council's subsequent vote to approve the separation agreement of City Manager Michael Hein and the appointment of Tim Maslow as Interim City Manager was influenced by illegal non-public deliberations, which could render the action void under Florida law.

Under the Florida Whistle-blower's Act (§ 112.3187, Fla. Stat.), individuals who report violations of law, gross mismanagement, or abuse of authority by public officials are granted specific legal protections and rights.

## 1. Protection from Retaliation

It is strictly unlawful for a government agency or independent contractor to take **adverse personnel action** against an employee for a protected disclosure. This includes protection against:

- **Termination** or dismissal.
- **Demotion**, suspension, or reduction in hours/pay.
- **Workplace harassment** or negative performance reviews meant as punishment.
- Any action affecting the "rights or interests" of the person in retaliation.

## 2. Right to Confidentiality

The identity of the whistleblower may only be disclosed if it is absolutely necessary for the investigation or required to protect public health and safety.

## 4. Right to File a Civil Action

If the local government (City of Groveland) has not established a specific administrative procedure for whistleblower complaints, you have the right to bring a **civil lawsuit** in a court of competent jurisdiction within **180 days** of the retaliatory act.

# EXHIBIT C

EXHIBIT C

# WHISTLEBLOWER COMPLAINT: FORMAL ALLEGATION OF SUNSHINE LAW VIOLATION

**TO:** Office of the State Attorney, 5th Judicial Circuit / Florida Commission on Ethics
**FROM:** Shawn Ramsey
**DATE:** February 22, 2026
**SUBJECT:** Alleged Sunshine Law Violations by **Mayor Keith Keogh**, City of Groveland

## 1. ENTITIES AND INDIVIDUALS INVOLVED

- **Subject of Complaint:** Mayor Keith Keogh, City of Groveland.
- **Witnesses to Communication:** Councilwoman **Amy Jo Carroll**, Interim City Manager **Tim Maslow**, City Attorney **Anita Geraci-Carver**, and other members of the **Groveland City Council**.

## 2. DESCRIPTION OF ALLEGED VIOLATIONS

This complaint alleges that Mayor Keith Keogh engaged in improper "serial communications" and "polling" of elected officials outside of a noticed public meeting, in direct violation of Florida Statute 286.011 (Sunshine Law).

- **Circumvention of Public Process:** Prior to the official public meeting, Mayor Keogh reportedly initiated telephone conversations with multiple elected officials to discuss a future agenda item regarding the **Michael Hein separation agreement**.
- **Direct Influence/Polling:** During these private calls, the Mayor explicitly informed at least one voting member, **Amy Jo Carroll**, that the council needed to ensure Community Development Director **Tim Maslow** was voted into the role of Interim City Manager.
- **Admission of Conduct:** At a scheduled public workshop on **Thursday, February 19, 2026**, Mayor Keogh openly acknowledged his direct, private communication with each elected official regarding the separation agreement and interim appointment.

## 3. EVIDENCE OF DISCLOSURE

During the aforementioned workshop on February 19, 2026, Councilwoman Amy Jo Carroll approached Interim City Manager Tim Maslow and City Attorney Anita Geraci-Carver to disclose and "confide" the details of the private conversations initiated by Mayor Keogh. Several other voting members have since confirmed they were also contacted by the Mayor regarding these matters prior to any open meeting.

**4. LEGAL IMPLICATIONS**

Under Florida law, a knowing violation of the Sunshine Law is a **second-degree misdemeanor**. Private discussions between board members about matters that will foreseeably come before that board for action are strictly prohibited to ensure the public's right to witness the decision-making process.

**5. REQUESTED ACTION**

I request a formal investigation into these communications to determine if the City Council's subsequent vote to approve the separation agreement of City Manager Michael Hein and the appointment of Tim Maslow as Interim City Manager was influenced by illegal non-public deliberations, which could render the action void under Florida law.

Under the Florida Whistle-blower's Act (§ 112.3187, Fla. Stat.), individuals who report violations of law, gross mismanagement, or abuse of authority by public officials are granted specific legal protections and rights.

## 1. Protection from Retaliation

It is strictly unlawful for a government agency or independent contractor to take **adverse personnel action** against an employee for a protected disclosure. This includes protection against:

- **Termination** or dismissal.
- **Demotion**, suspension, or reduction in hours/pay.
- **Workplace harassment** or negative performance reviews meant as punishment.
- Any action affecting the "rights or interests" of the person in retaliation.

## 2. Right to Confidentiality

The identity of the whistleblower may only be disclosed if it is absolutely necessary for the investigation or required to protect public health and safety.

## 4. Right to File a Civil Action

If the local government (City of Groveland) has not established a specific administrative procedure for whistleblower complaints, you have the right to bring a **civil lawsuit** in a court of competent jurisdiction within **180 days** of the retaliatory act.